### McMULLIN v. McMULLIN.*

#### S. F. No. 2533; December 30, 1902.

#### 71 Pac. 108.

**Divorce—Desertion—Voluntary Separation.**—In an action for divorce for desertion, evidence held insufficient to support a finding that the separation between plaintiff and defendant was voluntary, and with defendant's consent.

**Divorce—Desertion—Curing by Offer to Return.**—Where a husband deserted his wife against her consent, he could not, eighteen years thereafter, cure such desertion by an offer to return, so as to entitle him to a divorce for desertion on the wife's refusal of his offer.

APPEAL from Superior Court, City and County of San Francisco; George H. Bahrs, Judge.

Action by Thurlow McMullin against Virginia McMullin. From a judgment in favor of plaintiff, defendant appeals. Reversed.

Denson & Schlesinger for appellant; Chas. S. Wheeler and Bishop & Wheeler for respondent.

VAN DYKE, J.—This is an action for divorce, in which plaintiff had judgment. Defendant moved for a new trial on a bill of exceptions, which was denied. The appeal is from the judgment and order denying the motion for a new trial. The suit is prosecuted by the plaintiff on the ground of desertion. The parties intermarried on the 15th of February, 1871. A son was born March 17, 1872, and this suit was commenced April 9, 1898, in which it is charged the defendant deserted the plaintiff on April 10, 1896. The court finds: "That in the year 1877 plaintiff voluntarily separated himself from the defendant, and thereafter, until on or about the tenth day of April, 1897, continued to live

———

separate and apart from the defendant; but that the said separation was not against the wish or will of said defendant, but was wholly acquiesced in and consented to by the said defendant. That plaintiff did not, in the year 1877, willfully desert or abandon the defendant, nor was plaintiff's separation from the said defendant with the intent then and there to desert the defendant, nor has the plaintiff ever since or at any time continued to or kept up or continued the said or any separation or abandonment, but that, on the contrary, the separation of plaintiff from defendant in the year 1877 was, and thereafter until the tenth day of April, 1895, continued to be, with the full acquiescence and consent of defendant.''

1. The contention on the part of the appellant that this finding is unsupported by the evidence we think is well taken. In reference to the desertion, or, as called by the court, ''separation,'' in 1877, the defendant testifies as follows: ''In the morning when we were down to breakfast, and sat there, and he started to go, he went back first into the kitchen, and discharged the cook, in my presence, and I told the cook not to pay any attention; that he must remain. He told the nurse to pack his trunk; that he would send for it that day; and then he left, and during the day he sent for the trunk by an expressman, and when I saw that he was there I interrogated him to find out where he was going to take the trunk, and the expressman did not tell. That was the last time that he ever was in the house. The trunk was ready to go. The nurse had packed it. It was not closed, and just before it was closed I put in a little shoe—one of the pair of shoes; a little kid shoe, the first my baby had ever worn—and laid it on the tray of the trunk after the things were all packed. That was one of my baby's shoes. And I had a pair of cuff buttons that I had given him Christmas before we were married and rather too handsome for him to wear daily, and liable to be broken, and he asked me to put them aside, and take care of them for him. I put those on top of the tray of the trunk, and I wrote a few words on a piece of paper, and put them on top of the cuff buttons. I have not seen the piece of paper since. I remember about what the words were. I said: 'I married you for love. I have lived with you for love, and I would have clung to you forever for love.

You have broken my heart. You have wrecked my life. May those who have done this thing meet with just punishment. God help us all, and keep you from harm. Your wife.' I directed it, 'My husband.' I laid it on top of the buttons, that he must see it. It was impossible for it to get lost. I know he must have seen it. I put it in the tray of the trunk beside the little shoe. The trunk was locked by the nurse, and the expressman took it away. I have never at any time had any agreement or correspondence or talk with Mr. McMullin, or anyone in his behalf since then, to live separate." Plaintiff's attorney here admitted that Mrs. McMullin was a woman of education and refinement. The defendant further testified: "I lived with my father up to the time of his death, about fifteen years ago, and since then with my mother; and they have supported me and my child, barring the time that I was working for my living. I worked in the mint for over eight years, and devoted my salary to the support of my boy and myself." In reference to this the plaintiff testified as follows: "Q. By his Counsel: Did you say to your wife, on the 14th of November, 1877: 'I am going to desert you. My relatives are unwilling I should live with you. I wish you would pack my trunk?'" to which he answered: "I do not remember anything about the relative part. I remember asking to have—I do remember asking her to pack my trunk. Q. Did you, on the morning of November 15, 1877, before leaving the house, discharge, or attempt to discharge, the Chinese servant? A. I do not remember anything about the occasion of discharging either the servant or nurse. I have no recollection of any such occurrence. I don't remember of speaking to the servant about it. I sent for my trunk by an expressman, and got it. I have no recollection of seeing that little shoe in the trunk, and am sure I would remember it if I had seen it, and think I would have it now." On cross-examination the witness said: "I don't remember that shoe. I think, if I had received it, I would have it yet; but I can't recall it. I remember the pair of cameo cuff buttons. She gave them to me for a birthday or Christmas present before marriage. I guess they came in the trunk, but I can't remember about that. At any rate, I think they are somewhere among my effects now, but I have not seen them for years. She put them in the trunk, and I took them out.

I don't remember whether they were in a case when they came in the trunk. . . . . I don't remember about any note being put in the mirror or otherwise. I don't remember whether I sent any communication to her in any manner. After one, two, or three days I went back for the purpose of getting my things, 'or having them packed to leave. There might have been a request made for these things to be packed while I was away, but I don't know. When I went back for my things, she begged me to stay." He admits receiving the cuff buttons. "She put them in the trunk, and I took them out." He does not deny receiving the note and the baby's shoe which the wife says she sent with the cuff buttons, but merely says, "I don't remember." Here we have the direct and positive testimony of the wife that her husband left against her consent—in other words, deserted her—and that she did not acquiesce in his doing so; and the plaintiff, in his testimony, does not deny this; and there is no evidence whatever of a voluntary separation in 1877, as found by the court, or that the defendant consented or acquiesced in the desertion of the plaintiff.

2. The court also found: "That on the tenth day of April, 1895, while the plaintiff and defendant were living separate and apart by mutual acquiescence, the plaintiff offered in good faith to return and live with the defendant, and sought a reconciliation and restoration; that the defendant then and there refused it, and ever since has refused to accept said offer." We have already shown that the finding of the court that there was a separation by mutual acquiescence is not supported by the evidence. At the time of the pretended offer for reconciliation on the part of the plaintiff, an action for maintenance against him, instituted by the defendant herein, was pending. Judge Paterson, it seems, was the attorney of the defendant here, Mrs. McMullin, in her suit for maintenance. In his testimony herein he says: "During the pendency of that case I had a good many talks with Mr. Wheeler and Mrs. McMullin. . . . . I know that McMullin was exceedingly anxious to have the matter disposed of, and that there should be a divorce. Mr. Wheeler told me that Mr. McMullin would be willing to give her a liberal half of all the property he had, and would acquaint us fully what those properties, where they were, and what they were worth. Mrs. McMullin, basing her objection

on religious grounds, declined to listen to any proposition which would result in a divorce. She claimed to have religious scruples against such a thing as divorce, and said she never could have a happy day if she were a divorced woman. Necessarily, and taking these views, and being very positive about them, the matter of divorce was dropped, so far as she was concerned, in the negotiations.'' Then he refers to other negotiations, and on cross-examination he says: ''I intended to say that Mr. McMullin's desire, communicated to me, that there should be a divorce from his wife, to which she would not assent. Subsequently, I stated that I learned from either Mr. McMullin or Mr. McMullin. or Mr. Wheeler—I don't know which or where—that, unless that were done, Mr. McMullin would lay the foundation of a divorce himself by an offer of a home.'' Under these circumstances the so-called offer for reconciliation was made by the plaintiff. It is quite a formal document, in which he refers to the negotiations testified to by Judge Paterson, and concludes by saying: ''I therefore ask that you return and fulfill the marriage contract, and I offer to do and will do likewise. I will wait for you to-night at the parlors of the Occidental Hotel from 7 P. M. until 7:30 P. M.'' From the tone of the document and from all the surrounding circumstances detailed in the evidence, this offer was not made with the expectation of it being accepted, or for the purpose of reconciliation. When on the stand giving his testimony in reference to sending this communication, he was asked on cross-examination: ''When you sent this letter to Mrs. McMullin, did you expect that she would accede to it? A. I didn't know. Q. I asked you if you expected? A. I think I answered I didn't know. Q. Of course you didn't know whether she would accept or not. Did you expect she would? A. I did not know at that time. Q. You didn't know whether you expected it? A. I didn't know whether she would accept it or not. Q. Then I understand from you, you did not know whether she would accept that or not? Did you expect she would accept it? A. How could I tell that?'' The court then interposes: ''Did you have any expectation about it one way or another? A. Yes, naturally so, Judge; I would rather expect she would accept it. Q. By Defendant's Counsel: What reason did you have for expecting, after these

eighteen years of separation, under all these conditions, that she would accede to this letter, and go and live with you again?'' The court sustained an objection to this question, and thereby saved the witness from being compelled to answer it. Cross-examination is one of the most valuable means of eliciting truth, and, when properly conducted, should be upheld by the court, and not suppressed. This was the crucial point—whether the offer was made in good faith—and the defendant's counsel had a right on cross-examination to test the conscience of the plaintiff upon the question of his motive or good faith in making the offer. The wife, as it appears, had conscientious scruples against a divorce, and would not listen to any separation in that direction. She is rather to be admired for that than to be punished. Divorces for slight or trivial causes, or by collusion and connivance, are becoming so common as to be a scandal. The marriage relation is the foundation of all society, and, on the contrary, divorces, unless for special reasons, are demoralizing, and are not favored in the law. The code declares: ''If one party deserts the other, and before the expiration of the statutory period required to make desertion a cause of divorce, returns, and offers in good faith to fulfill the marriage contract, and solicits condonation, the desertion is cured'': Civ. Code, sec. 102. The statutory period referred to is one year, so that the plaintiff in this case could not avail himself of this provision of law, inasmuch as he had not sought condonation for nearly eighteen years. The code also declares: ''Consent to a separation is a revocable act, and, if one of the parties afterward, in good faith, seeks a reconciliation and restoration, but the other refuses it, such refusal is desertion'': Civ. Code, sec. 101. It is upon this section of the code that the plaintiff relies, but, as already shown, the separation was not by consent.

The judgment and order are reversed and cause remanded.

We concur: Harrison, J.; Garoutte, J.